UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| ROSE GRIFFIN, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | 3:21-CV-100-KAC-DCP |
| ) | |
| THE COPPER CELLAR CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the Court on Defendant The Copper Cellar Corporation's "Motion to Alter or Amend the Judgment" under Federal Rule of Civil Procedure 59(e) [Doc. 217]. For the below reasons, the Court denies the Motion.

**I.  Background**

On March 22, 2021, Plaintiff Rose Griffin sued Defendant for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* [*See* Doc. 1]. The Court ultimately held a bifurcated jury trial where the jury assessed (1) Defendant's liability on Plaintiff's (a) hostile work environment and (b) retaliation claims and (2) Plaintiff's eligibility for punitive damages in Phase One and the amount of damages in Phase Two.

During Phase One, Plaintiff testified that a co-worker (1) "grabbed [her] boobs" and a supervisor laughed about it afterward; (2) placed "two tomatoes, a cucumber, and some cream coming out of the cucumber" resembling "a man's penis with semen coming out of it" on her workstation; (3) "every day" would "nudge [her] in the back every time he passed by"; (4) "pushed [her] down on the salad station and put his arm on [her] back and his other hand on [her] hip . . . rubbing up on [her] and thrusting"; and (5) "unzip[ed] his pants, [stuck] his hands in his pants with corn starch and start[ed] massaging himself" in front of her while a supervisor "thought it was

funny" [Doc. 222 at 22-23, 26-27]. Plaintiff testified that she was "upset" and "crying" when Defendant's managerial staff told her "to keep [her] head down and [her] mouth shut" about what was happening to her [*Id.* at 47-48]. Plaintiff "felt sick" and "felt like puking" because she "felt like [she] had no say on who touche[d] [her] body" or "who had control" over her body [*Id.* at 48]. Plaintiff "felt so violated, so belittled," especially because Defendant's managerial employees "just laugh[ed] about" her harassment [*Id.* at 49]. Ultimately, she left her employment with Defendant [*Id.* at 50-51].

Plaintiff also testified that in "December of 2020," approximately eighteen (18) months after she left her job, she "felt like the walls were closing in" [*Id.* at 57; *see also* Doc. 193 at 1]. Because of "everything [that] happened," she "wrote a letter to" her family, "took [her] gun," "drove [her] car down into the woods," and "was going to shoot [her]self in the head" until she changed her mind in the woods [Doc. 222 at 57].

At the conclusion of Phase One, the jury found Defendant liable on Plaintiff's hostile work environment claim but did not find Defendant liable on Plaintiff's retaliation claim [*See* Doc. 201]. The jury separately determined that Plaintiff was not entitled to recover punitive damages [*Id.* at 2]. Trial proceeded to Phase Two—the amount of damages—before the same jury.

During Phase Two, Plaintiff's counsel specifically asked her to describe "what effect" "suffering through" a "hostile or abusive work environment" had on her [Doc. 225 at 4]. Plaintiff testified that she felt "humiliated" and did not "feel safe" going to work [*Id.* at 5, 7]. Plaintiff further responded that when searching for alternative employment, Plaintiff "g[o]t nervous because" she worried that the sexual harassment she experienced would "happen[] again" [*Id.* at 8]. And Plaintiff's son, who also worked for Defendant, testified that in the months following Plaintiff's departure, Plaintiff "stayed in a depressive state" [Doc. 203].

2

Even mentioning restaurant work would cause Plaintiff to become emotional and cry [*See id.*]. Based on Plaintiff's testimony, a jury could reasonably infer that part of the reason Plaintiff almost attempted suicide in 2020, was because she "wanted to stop dreaming about" the co-worker who harassed her [Doc. 225 at 6].

The jury awarded Plaintiff $314.22 in back pay and $179,000 in compensatory damages [*See* Doc. 206]. The Clerk entered judgment consistent with the verdict [*See* Doc. 209]. Defendant subsequently filed the instant Motion under Rule 59(e) [Doc. 217]. Thereafter, Plaintiff filed a "Response in Opposition" [Doc. 221].

## II. Analysis

There are generally four grounds upon which a court may grant a Rule 59(e) motion: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in the law; and (4) to prevent manifest injustice. *See GenCorp, Inc. v. Am. Intern. Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (citations omitted). Here, Defendant asserts that the Judgment "manifests a clear error of law and fact" for three (3) reasons [Doc. 217 at 1]. The Court addresses each argument in turn. None is persuasive.

***First***, Defendant contends that the Court should vacate the jury's $314.22 back-pay award because (1) the jury found for Defendant on Plaintiff's retaliation claim and (2) Plaintiff purportedly did not introduce evidence establishing that she "lost any wages due to the hostile work environment" she endured [Doc. 218 at 2-3, 10]. Title VII expressly contemplates back pay as one of the remedies available to a prevailing plaintiff. *See* 42 U.S.C. § 2000e-5(g). And the United States Court of Appeals for the Sixth Circuit has gone so far as to state that "[v]ictorious Title VII plaintiffs are presumptively entitled to backpay until the date judgment has been entered in the case." *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 840 (6th Cir. 1994) (quoting

3

*Shore v. Federal Express Corp.*, 777 F.2d 1155, 1159 (6th Cir. 1985)). But, of course, "the victim of discrimination must prove entitlement to backpay by providing information from which her damages can be determined." *Id.* at 841.

As a matter of law, the jury's conclusion that Defendant was not liable for retaliation does not preclude an award of back pay. Defendant relies primarily on *Betts v. Costco Wholesale Corporation*[1] to support its argument [*See* Doc. 218 at 10-11]. But *Betts* analyzed a jury award for "lost wages" under Michigan anti-discrimination law where the jury determined that the relevant Plaintiffs "had been lawfully discharged." *Betts*, 558 F.3d at 474-75.[2] In contrast, this case involved Title VII, and the jury made no finding that Plaintiff had been lawfully discharged. To establish her retaliation claim, Plaintiff had to show by a preponderance that: (1) she engaged in activity Title VII protects; (2) Defendant knew of Plaintiff's exercise of that protected activity; (3) thereafter, Defendant took an action that was materially adverse to Plaintiff; and (4) there is a causal connection between the protected activity and the materially adverse action. *See Huang v. Ohio State Univ.*, 116 F.4th 541, 561 (6th Cir. 2024) (citation omitted). That the jury found at least one of those elements lacking does not show that Plaintiff's employment with Defendant ended lawfully.

Further, based on the evidence the jury heard, it could have reasonably concluded that the sexual harassment Plaintiff experienced working for Defendant was so pervasive and extensive

---

[1] 558 F.3d 461 (6th Cir. 2009).
[2] *Betts* did not hold that back pay is unavailable to a plaintiff who prevails on a Title VII hostile work environment claim. *See Betts*, 558 F.3d at 474-475 (analyzing the district court's assessment of "the jury award of lost wages under Michigan law"). And even if the opinion could conceivably be read to suggest that conclusion, that reading would be inconsistent with later precedent affirming a jury's verdict awarding back pay for a Title VII hostile work environment claim. *See, e.g.*, *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 679, 682 (6th Cir. 2024).

4

that Defendant is responsible for Plaintiff leaving her employment and hence the $314.22 in back pay. That logic would not necessarily be inconsistent with the determination that Plaintiff failed to prove at least one element of her retaliation claim. And it would be consistent with case law in the Sixth Circuit that permits back pay as damage for a constructive discharge.[3] *See, e.g.*, *West v. Tyson Foods, Inc.*, 374 F. App'x 614, 639-40 (6th Cir. 2010). Accordingly, no clear error of law or manifest injustice is evident in the jury's verdict.

**Second**, Defendant argues that the Court should reduce the jury's compensatory damages award "because Plaintiff failed to prove that she sustained mental or emotional damage" [Doc. 218 at 11]. Title VII permits recovery of compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *See Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 313 (6th Cir. 2016) (quoting 42 U.S.C. § 1981a(b)(3)). The law "allows plaintiffs to recover for ongoing mental distress where that distress stems from the alleged discriminatory conduct." *Id.* (citations omitted). "[A] compensable injury in a hostile work environment claim need not rise to the level of affecting the psychological well-being of the victim"; instead, there need only be proof of "some mental distress." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1082 (6th Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). "A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden." *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996) (citation omitted). But generalized testimony that a plaintiff was "highly upset," could "only take so much," and "complain[ed] to management on a regular basis" is "insufficient to support [a] verdict for compensatory damages."

---

[3] To be clear, Plaintiff did not raise a constructive discharge claim, but the theory of damages would be similar.

5

*See Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1259 (6th Cir. 1985).

Here, the record supports the jury's compensatory damages award. Plaintiff detailed intense sexual harassment conducted through both expressive and physical means [*See* Doc. 222 at 22-23, 26-27]. At times she was left "upset" and "crying," demonstrating at least some mental distress [*Id.* at 47-48]. The evidence of mental distress was buttressed by Plaintiff's testimony that she "felt sick" and "felt like puking" because she "felt so violated, so belittled" and "felt like [she] had no say on who touche[d] [her] body" or "who had control" over her body [*Id.* at 48-49]. Plaintiff felt unsafe going to work and stated that she "g[o]t nervous" when looking for other employment because she worried that the sexual harassment she experienced would be repeated [Doc. 225 at 7-8]. *See Smith*, 813 F.3d at 314 (recognizing that the "lasting effects of the harassment" "after" a plaintiff leaves her job is competent evidence). And the jury could reasonably infer that Plaintiff contemplated suicide, at least in part, to "stop dreaming about" the harassment she endured at the hands of a co-worker [Doc. 225 at 6]. Plaintiff's son's testimony emphasized Plaintiff's lingering mental distress after she left Defendant [*See* Doc. 203]. As such, "the record is not so devoid of evidence" that Plaintiff suffered "some mental distress" "stemm[ing] directly from the harassment [s]he faced." *See Smith*, 813 F.3d at 314; *see also Moore*, 171 F.3d at 1082.

Defendant's arguments to the contrary are unavailing. Defendant argues that Plaintiff's testimony is "akin to that in" *Erebia*, where the plaintiff mustered mere generalized testimony about how he was "highly upset," could "only take so much," and repeatedly complained to management [*See* Doc. 218 at 13]. *See* 772 F.2d at 1259. This case is far more than *Erebia* with evidence of mental distress, physical illness, and a loss of the sanctity of a woman's own body. Defendant's other argument amounts to an attack on how the jury assessed credibility and weighed

6

the evidence it heard [*See* Doc. 218 at 11-12]. But nothing suggests that this assessment and weighing was so inappropriate as to constitute a clear error of law or miscarriage of justice.

***Finally***, Defendant maintains that even if there was sufficient evidence to support a compensatory damages award, the Court should reduce the jury's $179,000 award to a "nominal" amount "because the amount awarded is not proportional to the purported injury" [Doc. 218 at 13]. True, a Title VII compensatory damages award must be "proportional to the injury." *See Moore*, 171 F.3d at 1082. The award must not be "excessive when balanced against the harassment" endured. *Id.* And the "totality of the circumstances" must support the award. *See id.* at 1082-83.

Here, the record supports the jury's $179,000 compensatory damages award. As detailed above, Plaintiff recounted "a fairly steady stream" of sexual harassment, including breast grabbing, a phallic vegetable display on her workstation, and dry-humping, coupled with Defendant's managerial staff laughing and telling her to keep her mouth shut about what occurred [Doc. 222 at 22-23, 26-27]. *See also Moore*, 171 F.3d at 1082-83. Monetizing the emotional and psychological damage that flows from the events and circumstances Plaintiff described may be difficult. But the jury undertook its task diligently. And considering the "totality of the circumstances," the jury's compensatory damages award is not "excessive when balanced against the harassment" Plaintiff endured. *See id.*

### III. Conclusion

For the above reasons, the Court **DENIES** Defendant The Copper Cellar Corporation's "Motion to Alter or Amend the Judgment" [Doc. 217].

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge